COURT OF APPEALS
DECISION
DATED AND FILED

August 5, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2113-CR**

Cir. Ct. No. 2019CF215

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KARL M. HESS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Manitowoc County: JERILYN M. DIETZ, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Karl M. Hess appeals from a judgment of conviction and order denying postconviction relief. For the following reasons, we affirm.

## BACKGROUND

¶2 On September 9, 2018, police found two victims, who had not been heard from since September 7th, dead in their home. Both had been killed by gunshots. Investigators found three projectiles, three fired cartridge casings, and two unfired bullets, all from a nine-millimeter firearm. One victim's room had been ransacked, with a wallet, a small safe, and the other victim's phone missing.

¶3 Surveillance footage from a nearby residence showed a lighter-colored Toyota Highlander, with damage on the rear driver-side bumper and on the front bumper by the license plate, appearing near the victims' home at 4:30 p.m. on September 7, 2018. The police captain testified that he consulted with an individual familiar with Toyota models who identified the vehicle as a 2001, 2002, or 2003 model. The same footage showed a person parking that same Toyota Highlander at the victims' home at 10:01 p.m., exiting the vehicle, walking toward the home and disappearing from view, before driving away at 10:26 p.m. The same person returned in the same car around 11:00 p.m. and walked toward the victims' house before sprinting back to his car with an object in his hand at about 11:35 p.m., driving away three minutes later.

¶4 Police sent out a press release that included a photo of a Toyota Highlander. A man who had previously been a passenger in Hess's Toyota Highlander informed the police that Hess's vehicle was the same type of vehicle that was in the press release. He also informed police that Hess was going through financial difficulties at the time of the murders, and that one of the victims had

sometimes shown off his stack of tip money in Hess's presence. Police learned Hess had registered a 2001 golden-colored Toyota Highlander at his residence, and confirmed through footage from a past traffic stop that his vehicle had damage consistent with the vehicle in the surveillance footage. They eventually found the vehicle at an auto dealer where Hess had sold it.

¶5 Police then obtained "cell tower dump records," the cell phone records from Hess's phone carrier company, and cell phone records for the missing phone from the victims' house. The cell tower data reflecting the location of Hess's cell phone showed that, on the evening of September 7, 2018, the phone left Appleton by 4:00 p.m. and traveled to the area of the victims' home in Manitowoc. From 9:13 p.m. to 11:40 p.m., cell tower activity for his phone number showed his phone used two sectors of the same cell tower adjacent to the victims' home. Around 11:40 p.m., Hess's phone began traveling south. At the same time, the victim's missing phone traveled south, accessing the same cell towers as Hess's phone until it stopped moving altogether "on or around Interstate 43" south of Manitowoc. Hess's phone continued to Kenosha, where it remained overnight, before returning to Appleton.

¶6 On September 8, 2018, around 12:50 p.m., the cell tower records showed that Hess's phone appeared in the area of a pawn shop in Appleton, where police learned Hess had pawned a nine-millimeter firearm on July 26, 2018, before retrieving it on September 7th, at 3:10 p.m., and then pawning it again on September 8th at 1:00 p.m. After police recovered this firearm, an examiner concluded that Hess's nine-millimeter firearm was responsible for firing the three bullets and ejecting the three cartridge casings at the victims' house.

¶7     Two officers arranged via phone contact to stop by Hess's residence on March 26, 2019.  They audio-recorded the interview, which ran for five hours.  The two officers did not provide **Miranda**[1] warnings.  Around the 1-hour and 16-minute mark, Hess asked the officers, "[I]s there any set of circumstances in which, like, I get to see my kids again right now?"  An officer responded, "[S]upervised visits, yeah, of course; you know that."  Hess responded, "[N]o, … I meant like as a normal, like human being."  The officer responded: "You mean upon release?  Is that what you mean?"

¶8     At the 1-hour and 18-minute mark, Hess asked if he could take a day to think and meet with the officers the following day.  The following relevant interactions occur from that point onward:

> [1:18:15] [Hess:] "You know what if I felt like if I needed a day to think about it, and I didn't want to say anything today, like could I come see you guys tomorrow and talk about it?"
>
> [1:18:22] [Police Captain:] No … our DA knows we're there right now … I'm showing you things for a reason, because you know, you know that at this point … you know, we have to call our DA's office and let them know kind of what's happened during the course of our talk with you today.  Okay?  They already know.  They know everything already.  Okay?  We have to figure out which way we're going to handle it today.  We aren't going to wait in a couple of days.  And I'll tell you why, because a lot of times people continue to make mistakes and sometimes if you allow people … they, they make mistakes.
>
>     ….
>
> [01:19:25] [Officer:] "[the victims' families] need that closure.  And you know what?  You can bring that to them … do the right thing."

---

[1]  **Miranda v. Arizona**, 384 U.S. 436 (1966).

….

[1:19:47] [Hess:] "Well, I guess my question to you is then … if you guys already know what you guys have here and you're sitting here talking to me, like why didn't you guys just come in and …?"

[1:20:01] [Police Captain:] "Could have. We're trying to give you an opportunity to paint a better picture of yourself … you have to believe that if we did that … you're gonna look like a really bad person."

….

[1:21:07] [Hess:] "If we talked about everything a little further, does that mean that I'm going with you guys today?"

[1:21:13] [Police Captain:] "You could have gone before we walked in. And that's, that's what you asked me before."

….

[1:21:31] [Hess:] "If I were to like plead the fifth today, do I, do I get to have you guys come back tomorrow or something?"

[1:21:38] [Detective:] "Unfortunately not, no."

[1:21:40] [Police Captain:] Can I ask you something? Does it, does it look like, does it look like we don't have enough to take action today? … Yea, and that's why I'm asking. The whole, I'll be honest with you, you already know my reasoning. We can not, in good faith, we can't just let you, we can't walk out of here and come back tomorrow because you may, go to California, you may make another mistake, meaning, when I say make another mistake, meaning hurt yourself … because we've seen that happen before, … we can't allow that to happen, you know that, okay. People, people think about doing those things all the time. We've got to make sure that…

[01:22:24] [Hess:] "I wouldn't do that, for the same reason, I just want to have as much time with my kids as possible."

[01:22:30] [Police Captain:] "Yeah I get it. The problem for you is you don't get enough time to spend with your kids because of the marital situation."

5

[01:22:39] [Police Captain:] Tell us what happened. Tell us why … I think we understand somewhat the why, but we don't understand the why why."

[01:22:56] [Hess:] "I just, before I say anything about anything, like the supervised visits and stuff, it's like behind glass and all that, isn't it? Like I wouldn't get to hug them?""

¶9    Sometime between the 1-hour and 18-minute and the 2-hour and 45-minute marks, he confessed to killing both victims; he said he drove his 2001 Toyota Highlander to the victims' house intending to shoot one of them and take his cash. He confessed that he retrieved his firearm from the pawn shop on September 7, 2018, and used it to kill both victims. He said he knocked on their front door and asked to use the bathroom, but then donned gloves and drew his firearm once inside, shooting one of the victims while he was watching television, and he shot the other victim in her room to eliminate a witness. He confirmed he was in financial distress in September 2018, and that he searched one victim's room for cash, taking the safe, a wallet, and a phone. He said he tossed the phone from his vehicle while driving on I-43.

¶10    Two hours and forty-five minutes into the interview, officers informed Hess he was under arrest and in custody, again not providing *Miranda* warnings. On March 27, 2019, the following day, an officer interviewed Hess at a police station. This time, the officer provided *Miranda* warnings. Hess confessed once again.

¶11    Before trial, Hess moved to suppress all of his statements to law enforcement. The prosecution offered to provide the defense a written stipulation that Hess was first "in custody" for the purpose of *Miranda* once he was arrested 2 hours and 45 minutes into the March 26, 2019 interview at his apartment, which

6

the defense accepted. Because he was not given *Miranda* warnings at that time, all statements Hess made after the 2-hour and 45-minute timestamp in the March 26th interview were suppressed. Hess's attorney withdrew her motion to suppress the remaining statements, conceding she did not "have any cause to challenge the voluntariness after extensive review of the recordings and written discovery."

¶12    The State charged Hess with two counts of first-degree intentional homicide, and Hess was tried before a jury in June 2021. Hess called an expert witness to testify about false confessions. On the stand, Hess contradicted his confession. He said that, after one of the victims let him in to use the bathroom, he left his gun wrapped in his gloves in the victims' bathroom behind the toilet and went outside. He claimed he went back inside to find his gun missing, and then heard a gunshot followed by another gunshot. The jury found Hess guilty of both counts of first-degree intentional homicide. Hess received two consecutive life sentences without eligibility for extended supervision.

¶13    Hess filed a postconviction motion claiming that his trial counsel was ineffective for failing to make motions suppressing his confessions. He argued that officers took him into custody much earlier than the 2-hour and 45-minute mark during his March 26, 2019 interview, requiring suppression of most of his confession. He additionally argued that his March 27th confession should also have been suppressed as tainted by the lack of *Miranda* warnings on March 26th. Specifically, he argued that the two officers circumvented *Miranda* to obtain a confession on March 26th and subsequently asked him the same questions in a *Miranda*-warned interview the next day. He argued this practice violated *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion).

¶14    The trial court denied the motion after a ***Machner***[2] hearing.  The court noted "that the tone of the discussion did not change before and after he asked that question [about whether Hess could stop the interview and see officers the following day].  Officers did not become more argumentative, more forceful, less sympathetic, or even louder" after officers refused to leave and come back the following day.  The court reasoned that if Hess felt he was in custody, "the question would have been meaningless."  Hess appeals.

## STANDARD OF REVIEW

¶15    Our supreme court has outlined the standard of review for an ineffective assistance of counsel claim as follows:

> [w]hether a defendant received ineffective assistance of counsel presents a mixed question of law and fact.  This court will uphold the [trial] court's findings of fact, "includ[ing] the circumstances of the case and the counsel's conduct and strategy," unless they are clearly erroneous.  Whether counsel's performance constitutes constitutionally ineffective assistance of counsel, which requires a showing by the defendant that counsel performed deficiently and that the error or errors prejudiced the defendant, presents a question of law that this court decides de novo.

***State v. Domke***, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364 (third alteration in original; internal citations and some internal quotation marks omitted).  A defendant asserting an ineffective assistance claim must prove (1) that his counsel's performance was deficient and (2) that the deficient performance was prejudicial.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  If a defendant fails to prove one prong of the ***Strickland*** test, a court need not consider the other prong.  ***Id.*** at 697.

---

[2] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

**DISCUSSION**

¶16  Hess claims that: (1) police obtained most of his March 26, 2019 confession in violation of *Miranda*; (2) police obtained his subsequent statement at the police station through the prohibited "question first" technique; (3) his counsel performed deficiently in failing to maintain a motion to suppress Hess's statements; and (4) his defense was prejudiced by his counsel's deficient performance in regards to his confessions. We address each claim below.

**I. The March 26th statement did not violate *Miranda*.**

¶17  "[T]he Fifth Amendment requires law enforcement to inform suspects of their rights to remain silent and to have an attorney present during custodial interrogations." *State v. Bartelt*, 2018 WI 16, ¶27, 379 Wis. 2d 588, 906 N.W.2d 684 (citing *Miranda v. Arizona*, 384 U.S. 436, 458 (1966)). *Miranda* applies to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *Miranda* is to be applied "only in those types of situations in which the concerns that powered the decision are implicated[,]" and "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984) (citation omitted). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442.

¶18  The United States Supreme Court outlined the meaning of "custody" for the purposes of *Miranda* as follows:

> "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of

> "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning[.]

*Howes v. Fields*, 565 U.S. 499, 508-09 (2012) (alterations in original; internal citations omitted). Also, the inquiry requires "ask[ing] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*[,]" as "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Howes*, 565 U.S. at 509 (citation omitted).

¶19 Hess's situation is complicated in regards to the freedom-of-movement test. While the duration of Hess's March 26, 2019 interview was indeed quite long, extending approximately five hours, and he was placed in handcuffs at the end of the interview, those are not the only relevant factors. Some other factors are clearly against his claim, including that the officers did not physically restrain Hess in any way at the beginning of the interview, and that the officers had called ahead of time to arrange the interview at Hess's house rather than a station house.

¶20 The statements made during the interview around the 1-hour and 18-minute mark are especially important. Hess cites several statements by the officers implying he was already or would be taken into custody, such as an officer's mention of "supervised visits" and visitation "upon release" when discussing Hess's children. Further, while Hess did not directly ask to leave or invoke his right to remain silent, he simply asked what would happen if he were to

invoke that right, and the officers responded that they would not leave and come back the next day. His inquiry as to why the officers did not come and arrest him at the beginning of the interview is also important and can be viewed in different ways. It could be interpreted as an understanding that he was not yet in custody. It could also be interpreted he believed that he was in custody at that point in the interview, but confused as to why officers had even proceeded with the interview in the first place, if they already suspected him. Thus, these statements on their own do not conclusively establish that Hess could have reasonably believed himself to be in custody at that time.

¶21 *Bartelt*, 379 Wis. 2d 588, is instructive in this situation. In *Bartelt*, two officers scheduled an interview with a suspect that was to take place at a station house. *Id.*, ¶6. The officers did not handcuff or restrain the suspect, and spoke in a conversational tone the entire interview. *Id.*, ¶¶37, 48. The officers directly told the suspect he was not under arrest, but told the suspect, "[T]he easiest way to put some resolution to this is [for] the [] person that did this to take responsibility." *Id.*, ¶¶9, 14 (alterations in original). The suspect was not given a *Miranda* warning during the interview. *Bartelt*, 379 Wis. 2d 588, ¶9. The suspect confessed. *Id.*, ¶15. After 33 minutes of the interview, interrupted by a 7- to 8-minute pause, the officers arrested the suspect. *Id.*, ¶16. The court affirmed that the confession was admissible. *Id.*, ¶¶52-53. It explained that the suspect's arrest "at the end of his interview does not necessarily mean that he was in custody at any point prior to his arrest." *Id.*, ¶49.

¶22 Similarly, here, the officers did not employ a coercive tone in Hess's March 26, 2019 interview. Hess was arrested after his confession, and he was not given a *Miranda* warning. On the other hand, the location of Hess's interview was his own residence rather than the station house, which arguably renders his

interview less inherently coercive than in *Bartelt*. The other differences in support of Hess include the length of his interview, which was much longer than in *Bartelt*, and the lack of an explicit statement that he was not under arrest. Hess, however, does not argue that the length of the interview put him in *Miranda* custody. The lack of an explicit statement that Hess was not under arrest does not fully distinguish his case from *Bartelt*, which included similar pointed questioning that indicated police believed the suspect was culpable and were looking for a confession. Based upon the foregoing, we conclude that Hess was not in custody for the purposes of *Miranda*.

¶23 Moreover, even if he could distinguish *Bartelt* on the freedom-of-movement test, Hess fails to demonstrate "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[3] *See Howes*, 565 U.S. at 509. The trial court correctly noted "the tone of the discussion did not change before and after he asked [a] question. Officers did not become more argumentative, more forceful, less sympathetic, or even louder" after officers refused to leave and come back the following day. As discussed earlier, Hess was not physically restrained in any way, and at that point in the interview, he was not moved from his own residence, where he had voluntarily scheduled the interview a day in advance. It is clear that Hess's March 26, 2019 interview lacked the coercive pressures of a station house interrogation, and accordingly a motion to

---

[3] Hess did not explicitly address the coercive pressures requirement of *Howes v. Fields*, 565 U.S. 499, 508-09 (2012), in his initial brief, but only raised that in his reply brief. "We will not, as a general rule, consider issues raised by appellants for the first time in a reply brief." *Swartwout v. Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (Ct. App. 1981). We discuss it here to show that his argument would fail anyway.

suppress his confession before his formal arrest at the 2-hour and 45-minute mark would have been meritless.

**II. The March 27th confession was not obtained in violation of *Seibert*.**

¶24 Hess argues that his March 27, 2019 confession, in which he was given a *Miranda* warning, was also inadmissible under *Seibert*, 542 U.S. at 611 (plurality opinion). In *Seibert*, an interrogating officer was instructed to provide no *Miranda* warning until the suspect confessed, and once the suspect had done so, to then provide a *Miranda* warning and prompt the defendant to repeat his confession. *Seibert*, 542 U.S. at 604-05 (plurality opinion). Thus, while the first confession would be inadmissible, the suspect would be primed to cover the same ground in a setting where it would be admissible. *Id.* at 604 (plurality opinion). Following this method, the officer paused the interrogation for 20 minutes after obtaining the first confession from the suspect, and then resumed the interrogation with a *Miranda* warning to obtain the second. *Seibert*, 542 U.S. at 605 (plurality opinion).

¶25 In *Seibert*, the state of Missouri had cited to *Oregon v. Elstad*, 470 U.S. 298 (1985), to argue that this method is permissible. *Seibert*, 542 U.S. at 614 (plurality opinion). In *Elstad*, the officer's initial failure to warn was due to oversight, and the first confession occurred during a brief conversation at the suspect's home while the second was obtained at a police station. *Elstad*, 470 U.S. at 301. The United States Supreme Court held that the second confession, given with a full *Miranda* warning, was admissible under the circumstances. *Elstad*, 470 U.S. at 318.

¶26 In *Seibert*, however, a majority held that the second confession obtained by the officer after intentionally omitting any *Miranda* warning from the

13

first was inadmissible. *Seibert*, 542 U.S. at 604 (plurality opinion). Four justices joined the plurality opinion, with Justice Kennedy concurring in the judgment, but not the reasoning, of the plurality. *Id.* at 603 (plurality opinion); *id.* at 618 (Kennedy, J., concurring). The plurality opinion outlines a series of objective factors to evaluate "warnings delivered midstream[,]" including:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round [of interviews] as continuous with the first.

*Id.* at 615 (plurality opinion). The plurality explained that while the different setting of each confession in *Elstad* could have created a "distinct experience … presenting a genuine choice whether to follow up on the earlier admission[,]" the brief pause and unchanged location in *Seibert* could not have. *Seibert*, 542 U.S. at 615-17 (plurality opinion).

¶27    "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'"[4] *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). Justice Kennedy's concurrence supports limiting

---

[4] The State contends that *Marks v. United States*, 430 U.S. 188, 193 (1977), does not apply to *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion) because it is unclear whether a majority endorsed Justice Kennedy's subjective test. *See United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) ("When … a concurrence that provides the fifth vote necessary to reach a majority does not provide a 'common denominator' for the judgment, the *Marks* rule does not help to resolve the ultimate question."). We need not address this concern because *Seibert* does not apply to Hess's confessions under the reasoning in either the plurality or concurrence.

*Seibert* to "a narrower test applicable only in the infrequent case … in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Kennedy elaborated that even in the case where two-step interrogation was intentional, curative measures could be taken, such as "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning[.]" *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Because the officer took no curative measures in *Seibert*, Justice Kennedy concurred in judgment. *Id.*

¶28    Hess cannot establish that *Seibert* applies in this case under either the plurality or concurrence reasoning. Under the plurality rationale, the fact that the confessions were obtained in separate locations and more than a day apart more closely resembles *Elstad* than *Seibert*. Hess's claim fails under Justice Kennedy's subjective test as well, because not only is there no evidence the officers omitted *Miranda* warnings from the first confession as part of a deliberate strategy, but the time between the first and second confession would serve as a curative measure that would render the second confession admissible regardless. We conclude an objection that Hess's March 27, 2019 confession was inadmissible under *Seibert* would have been meritless.

### III. Hess's counsel's failure to move to suppress the confessions at trial was not deficient performance.

¶29    "To establish the denial of a defendant's constitutional right to the effective assistance of counsel at trial, the defendant bears the burden of proving that counsel's performance was deficient and that such performance prejudiced the defense." *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111. "To demonstrate deficient performance, a defendant must show that counsel's representation fell below an objective standard of reasonableness considering all

the circumstances." *State v. Ruffin*, 2022 WI 34, ¶30, 401 Wis. 2d 619, 974 N.W.2d 432. "[C]ounsel's performance need not be perfect, or even very good, to be constitutionally adequate." *Id.* "[C]ounsel's failure to bring a meritless motion does not constitute deficient performance." *State v. Wheat*, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441.

¶30    Hess contends his counsel performed deficiently by failing to move for the exclusion of his confessions. We disagree. His counsel initially moved to dismiss all of Hess's statements during both interviews initially, and succeeded in suppressing all statements after the 2-hour and 45-minute mark in the March 26, 2019 interview. Counsel then withdrew her motion to suppress the remaining statements, explaining that she did not "have any cause to challenge the voluntariness after extensive review of the recordings and written discovery." While she could have maintained her motion to suppress the rest of the March 26th interview, she was under no obligation to do so for her performance to be constitutionally adequate. As we explained above, a motion to suppress Hess's March 26th confession would have failed because Hess could not demonstrate coercive pressures even if he were not free to leave. Hess's counsel was under no obligation to move to suppress Hess's March 27th confession either, given the difficulty of discerning *Seibert*'s holding from its plurality and concurrence. *See State v. Robinson*, 2024 WI App 50, ¶32, 413 Wis. 2d 534, 12 N.W.2d 535 ("[A]n attorney is not deficient for failing to pursue an 'unsettled proposition of law.'" (citation omitted)). In light of these circumstances, it was reasonable for Hess's counsel not to maintain a motion for suppression of the remainder of his confessions and, accordingly, there was no deficient performance.

## IV. There was no prejudice from counsel's failure to object to the admissibility of Hess's confessions.

¶31     While a defendant needs to demonstrate both deficient performance and prejudice to prove ineffective assistance, *State v. Jeninga*, 2019 WI App 14, ¶11, 386 Wis. 2d 336, 925 N.W.2d 574, and we have determined Hess has not met the first prong, we nevertheless address his arguments on prejudice. "To warrant setting aside the defendant's conviction, the defendant must demonstrate that his counsel's deficient performance was prejudicial to his defense." *State v. Carter*, 2010 WI 40, ¶37, 324 Wis. 2d 640, 782 N.W.2d 695 (citing *Strickland*, 466 U.S. at 691-93). "[T]he defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Carter*, 324 Wis. 2d 640, ¶37 (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Johnson*, 153 Wis. 2d 121, 129, 449 N.W.2d 845 (1990) (citation omitted). "In application of this principle, reviewing courts are instructed to consider the totality of the evidence before the trier of fact." *Id.* at 129-30.

¶32     The State cites four categories of evidence to contend there was no prejudice even if the confessions were inadmissible: Hess's ownership of the Toyota Highlander that was recognized from the surveillance footage; law enforcement's retrieval of Hess's firearm shown by an examiner to be the victims' causes of death; cell tower data linked to Hess's cell phone; and witness testimony that helped establish Hess's motive. Hess agrees that those four categories of evidence would survive a challenge to the sufficiency of the evidence, but contends that the strength of that evidence "was greatly magnified by the corroboration contained in … Hess'[s] confessions." Specifically, he alleges that surveillance footage on its own never identified a specific vehicle or plate number

but that Hess admitted he went to the victims' home; that concerns about the strength of the motive "vanished" when the jury was informed that Hess admitted he went to the victims' home to take the money; that the question of whether Hess's gun was the murder weapon "melted away" when the police captain told the jury that Hess confessed to using the gun to shoot the victims; and that the cell phone data only showed his general location without his confession to corroborate it. He argues that because the confessions confirmed the "circumstantial evidence" against him, the admission of his confessions prejudiced his defense.

¶33 We disagree. While the confessions undoubtedly improved the prosecution's case against him, there is no reasonable probability Hess would have been acquitted even without that evidence. He asserts police could not identify a license plate in the surveillance footage, but Hess's vehicle matched the specific model, color, and damage on the rear driver-side bumper and on the front bumper by the license plate, which was discernable in the surveillance footage. As for his cell phone data, the fact that one of the victim's phones traveled with his own down the freeway after the victims had been killed is strong evidence that cannot be dismissed by the precision of the location data. Additionally, the toolmark's testimony that the projectiles found at the victims' residence had all been fired by Hess' nine-millimeter handgun, which he had retrieved the night of their deaths, was compelling evidence that Hess's firearm was the murder weapon. Considering the weight of that evidence, any uncertainty about the witness testimony as to Hess's motive would have done little to undermine the case against him.

¶34 Further, the prosecution's case did not rely solely on circumstantial evidence as it included direct witness testimony that Hess drove the kind of vehicle seen in the video and that established his financial motivation. Even so,

18

the mere fact that some evidence was circumstantial does not diminish the weight of that evidence because "circumstantial evidence may be and often is stronger and more satisfactory than direct evidence." ***State v. Johnson***, 11 Wis. 2d 130, 135, 104 N.W.2d 379 (1960). Given the weight of the evidence against him, we conclude Hess was not prejudiced even if his counsel performed deficiently by failing to continue her motion for the suppression of all his statements to police.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2023-24).